## SANTA MARIA DEL ORO MINES CO. v. INTERNATIONAL MINING CORPORATION.

### No. 1122.

District Court, D. Delaware.

June 18, 1937.

William A. Wilson (of Wilson & Curry), W. Denning Stewart, and Edward E. Reinhold, all of Pittsburgh, Pa., and Christopher L. Ward, Jr. (of Marvel, Morford, Ward & Logan), of Wilmington, Del., for plaintiff.

William Wallace, J. Arthur Leve, and George W. Whiteside (of Chadbourne, Wallace, Parke & Whiteside), all of New York City, and Robert H. Richards and Aaron Finger (of Richards, Layton & Finger), all of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is a suit in equity either to enforce or to rescind certain contracts. The contracts call upon defendant to furnish money, labor, and engineering skill to develop old Mexican gold mines belonging to plaintiff.

In the bill of complaint filed July 30, 1935, by Santa Maria Del Oro Mines Company, plaintiff (hereinafter called "Santa Maria"), against the defendant International Mining Corporation (hereinafter called "International"), plaintiff alleges in substance: For more than twenty years it had been the owner of certain gold mines located in the state of Durango, Republic of Mexico. It had expended large sums of money upon their development and maintenance but had never extracted any gold. Since 1918 "Cocinera," the principal mine, had been flooded with water. By three contracts, to wit, (1) the contract made August 28, 1933, between plaintiff and defendant (hereinafter called the "First Contract"), (2) a contract dated July 27, 1934 (hereinafter called the "Mexican Contract"), between defendant and Compania Minera Santa Maria del Oro, S. A., a Mexican corporation (hereinafter called "Mexican"), and (3) a contract between plaintiff and defendant made November 13, 1934 (hereinafter called the "Second Contract"), defendant undertook to advance such sums as in its judgment were "reasonably necessary for the proper exploration and development of the mines and properties of Santa Maria, and for the purchase and installation of an adequate mill and other equipment for production operations and for working capital in connection therewith; provided, however, that the maximum which International was obligated to advance to Santa Maria, pursuant to the terms of the said contract was not to exceed the sum of $500,000," subject also to the right of defendant to cease making advances at any time at its election. By said contracts plaintiff and defendant became associated as joint adventurers in the enterprise of placing upon a commercially productive basis said mines. By said contracts defendant was bound to purchase and install an adequate mill and other equipment for production, if and when the entire sum of $500,000 was advanced under said contracts. In said contracts plaintiff granted to defendant an option to acquire 60 per cent. of its common stock to be delivered when and if defendant advanced the sum of $500,000. Defendant also became bound to purchase and install an adequate mill for production if and when it exercised said option. Defendant advanced part of the $500,000 to plaintiff before July 12, 1934, when Mexican was organized and thereafter advanced the balance to Mexican. The bill further alleges that defendant violated its fiduciary duty and its obligation under the contracts to build and equip an adequate mill and that it failed to set aside a sufficient sum therefor out of the $500,000, but spent $325,000 thereof for improper, unnecessary, speculative and reckless development. And, that defendant caused Mexican to borrow additional moneys in violation of plaintiff's rights. The bill prays for an accounting and for the specific performance of the contracts. However, there is one prayer for rescission of the contracts predicated upon the theory of a failure of consideration.

By answer filed September 7, 1935, defendant denies that it ever assumed any

318

fiduciary relationship towards plaintiff. Defendant avers that the full measure of its obligation is set forth in article 7 of the First Contract reading:

"7. International shall exercise full control and direction of all mining and milling operations in the said mining properties (except that the treatment of ore on the stock piles at the mine shall not be undertaken by International without the express approval in writing of Santa Maria) and over all expenditures in connection therewith, through such engineers as it may have designated for appointment by Santa Maria for such direction, control and supervision, provided, however, that one consulting mining engineer may be selected and appointed by Santa Maria to act with such engineer or engineers as are designated by International for appointment by Santa Maria (such consulting engineer designated by Santa Maria may be paid by Santa Maria from funds advanced by International). * * *"

Defendant avers that it has fully and fairly performed every obligation imposed upon it with respect to the furnishing and spending of the said $500,000, and that the uses and purposes for which said $500,000 were spent were uses and purposes provided for in the contract and that said expenditures were shown on weekly progress reports and their accompanying financial statements, which were regularly sent from week to week to plaintiff.

Upon the issues thus framed by the bill and answer hearings were held between November 25, 1935, and January 23, 1936. Briefs and requests for findings of fact and conclusions of law were duly filed by May, 1936.

June 4, 1936, and before final argument defendant filed a motion for leave to introduce additional testimony. June 17 and July 6, 1936, further hearings were held. The issues before the court at these hearings were subsequently framed by an amendment to the bill of complaint and the answer thereto. The amendment charges:

"Fiftieth: For some years prior to August 28, 1933, one George A. Schroter, who is by profession a Consulting Mining Engineer was in the employ of the plaintiff company as its Consulting Engineer and was as well its confidential agent entrusted with the authority and responsibility of negotiating for the sale or operation of the property herein involved. The said George

A. Schroter on behalf of the plaintiff as its agent carried on the negotiations with the defendant company mentioned in paragraph Fifth, which resulted in the contract 'Exhibit 1' [of August 28, 1933] attached to this bill. Prior to August 28, 1933 plaintiff through its President, Grant Curry, had agreed with the said George A. Schroter that for his services in effecting an arrangement similar to that entered into between plaintiff and defendant, that said George A. Schroter would receive as his compensation, ten per cent (10%) of the proceeds of said transaction, as received by plaintiff. Pursuant to said agreement the plaintiff company has delivered to said George A. Schroter 62,400 shares of the common capital stock of the Mexican corporation herein mentioned. Unknown to the plaintiff company and without its consent and in violation of its fiduciary obligation to the plaintiff company, the defendant company at, or about, [August 28, 1933] the date of the contract 'Exhibit 1' hereto entered into a secret arrangement with the said George A. Schroter by which it agreed to pay to the said George A. Schroter 2% of the Common stock as received by it as a result of the transaction between plaintiff and defendant. Said arrangement was confirmed by a resolution of the Board of Directors of the defendant company on June 12, 1935, a true and correct copy of the minutes of said corporation on said subject being hereto attached and marked 'Exhibit 5'. The defendant was fully aware that said Schroter was the confidential agent of the plaintiff company and that the plaintiff company was relying upon the said Schroter for his unprejudiced and unbiased judgment in the negotiations above referred to, and as well for the unbiased and unprejudiced advice of the said Schroter in the matters provided for in the contract between the parties. Plaintiff avers that the act of the defendant in paying or promising to pay the said Schroter a secret commission has deprived the plaintiff of such unbiased and unprejudiced judgment and is in violation of the legal and fiduciary obligations of the defendant and said Schroter to the plaintiff and that as a result thereof the contract 'Exhibit 1' hereto and subsequent contracts, which are subsidiary thereto, are null and void and that by reason of the payment or the promise of payment of the said commission to said Schroter a fraud has been perpetrated upon the plaintiff en-

titling the plaintiff to rescind the contract 'Exhibit 1' and the contracts subsidiary thereto. Plaintiff avers that the first actual knowledge which it had of the matter herein averred, was on November 18, 1935, which was long subsequent to the filing of the Bill herein, when the said Schroter admitted to a representative of the plaintiff company that a commission had been promised him by the defendant company. The defendant did not disclose to the plaintiff the fact of the arrangement between it and said Schroter until the defendant put in its testimony on the trial."

Plaintiff adds the following additional prayers:

"(j) That the contract dated the 28th day of August, 1933, between Santa Maria Del Oro Mines Company and International Mining Corporation, * * *, may be decreed to be void and cancelled, rescinded and held for naught, and that all other contracts and agreements between the said parties may be likewise decreed to be void and cancelled, rescinded and held for naught in so far as may be necessary to give full effect to the cancellation and rescission of the said contract, 'Exhibit 1'.

"(k) That 411,000 shares of the common capital stock of the Mexican Company, heretofore delivered to International as alleged in paragraph Twenty-fifth of this Bill of Complaint, may be cancelled, or in the alternative that this Honorable Court may order and require International to surrender and deliver up the same to the plaintiff, Santa Maria.

"(l) That International may be ordered and required to transfer and deliver over to the plaintiff, Santa Maria, the shares of stock which it has agreed to give to George A. Schroter as a commission, as alleged in paragraph Fiftieth of this Bill of Complaint as amended, consisting of 8,220 shares of the common capital stock of the Mexican Company.

"(m) That this Honorable Court may grant its writ of injunction commanding and enjoining International and its directors, agents, servants and employees to cause the Mexican Corporation to cancel and treat as void the shares of the common capital stock of that corporation delivered by the plaintiff, Santa Maria, to the said Schroter, as alleged in paragraph Fiftieth of this Bill of Complaint as amended, consisting of 62,400 shares of the said common capital stock."

August 18, 1936, defendant filed its answer to the amendment to the bill of complaint as follows:

"I. It [defendant] denies each and every allegation set forth in paragraph Fiftieth of the amendment to bill of complaint, except it admits that prior to August 28, 1933, one George A. Schroter was in the employ of plaintiff as its Consulting Engineer and was its agent for the purpose of negotiating for the sale and operation of the property involved in this litigation, and that said Schroter carried on such negotiations leading up to the making of the contract between plaintiff and defendant executed on August 28, 1933, * * * and except that plaintiff delivered to defendant 27,400 shares of the common capital stock of Mexican.

"II. Further answering said paragraph Fiftieth of the amendment to bill of complaint, it [defendant] admits that Exhibit 5 annexed to the amendment to bill of complaint purports to be an extract from the minutes of the meeting of the Board of Directors of International Mining Corporation held June 12, 1935, but it denies that said minutes correctly set forth the transaction between defendant and Schroter, in that the arrangement between defendant and Schroter was made not earlier than December 1933, at a time when said Schroter, to the knowledge and with the consent of plaintiff, was acting for both plaintiff and defendant, and said arrangement was contingent upon it being acceptable to plaintiff, and defendant further alleges that the compensation agreed by said arrangement to be paid has not yet been paid to said Schroter and will not be so paid unless and until plaintiff consents thereto."

### The Parties.

Santa Maria was organized in 1911 under the laws of the state of Arizona. Its capital stock is owned by Grant Curry of Pittsburgh, its president, and his brothers and sisters.

International was organized in 1929 under the laws of the state of Delaware. It is engaged in the business of developing and investing in mining properties. Its capital consists of $10,000,000 cash, privately subscribed. It never sought aid from the public by stock offerings. The president and three of the vice presidents were mining engineers. It also maintained a small staff of engineers and assistants in

the field and in the office. Karl F. Hoffmann, vice president of defendant, testifies:

"Q. Can you give me any idea of how many different mining properties International has developed in that time? A. Yes. We have developed several, six or seven, and I think I have a list here which shows some of them. With partners we developed the Bulolo Gold in New Guinea. We took over the granite mine in Cripple Creek, Colorado, and did further development on that. We developed the Alvarado mine in Arizona. We did some work on the Liberty Hill mine in California, and we did quite a lot of work on Penos Altos mine in New Mexico. We did some work on the de Santos mine in Canada. We helped on the Siamese tin venture in Siam, and helped finance the Golden Queen in California. We did development work on the London Butte gold mines in Colorado. We did some work in the Northern Chibougamau in Canada. There are a number of other smaller ones.

"Q. As to all of these properties, how were they financed by International, privately or through public offerings? A. They were all financed privately, either by ourselves or with partners."

### History of Santa Maria.

Plaintiff's properties were approximately three miles long and a mile and a half wide. The principal mines are Santo Domingo, Colorado, Cocinera, Compania, and Santa Anna. They were originally worked by Antiguas and are probably 300 years old. In the 80's Lustre Mining Company of Pittsburgh operated the mines. It built a 100-ton stamp mill using the amalgamation process. The ores were found to be base sulfides and the process was abandoned. About 1900 the mines were leased to National Mines & Smelter Company of Pittsburgh. A matte smelting plant was built with a capacity of 500 tons per day. This smelter operated from 1905 to 1910. From 1910 to 1918 work at the mines was confined to development. In 1915 a 75-ton pilot mill and sintering plant was built for experimental purposes. In 1918 Pancho Villa raided the company store and offices and dynamited the power plant. The records were destroyed except certain mine maps, assay plans, and survey notes.

The principal mine was the Cocinera. Before 1918 it was operated by National Mines Company, plaintiff's lessee. In 1910 William Curry, a brother of plaintiff's president, became interested in these properties. From time to time he advanced about $800,000 to carry on the development in sinking a shaft and exploring the lower levels.

After the Villa raid, this mine filled up with water. It took approximately 6 years to fill the mine. Instead of 12 million gallons of water, being the cubical content of the mine as estimated by plaintiff, a vast basin tributary to the Cocinera workings had been filled with water and had to be drained before the mine could be dewatered. This involved pumping 530 million gallons of water to reach the seventh level, more than 40 times plaintiff's estimate. After the death of William Curry, $200,000 more was spent in a drilling campaign to determine the extent of the ore body. This work accomplished nothing and was abandoned. After 1910 over $1,000,000 was spent on the property without any profitable operations. In fact, no gold was extracted from the mine since shortly before 1910.

In 1927 George A. Schroter, a mining engineer, was employed by plaintiff to interest mining companies in developing the properties. He sought aid from Lucky Tiger Mining Company, Consolidated Gold Fields, Newmont Mining Company, American Smelting & Refining Company, United States Smelting & Mining Company, and defendant, but with no success. In 1933 when the United States went off the gold standard the value of gold rose in terms of world currencies. At the same time the exchange rate of the peso depreciated in favor of the American dollar. In the summer of 1933 Schroter again approached defendant. From an engineering standpoint, no accurate information was available concerning the nature and extent of the ore body or the metallurgical character of the ores. There can be no doubt about the speculative character involved in the development of a flooded mine particularly where the ore is of low grade and of a character difficult to treat. Rogers, one of plaintiff's experts, testified: "I would not advise anybody to attempt to unwater an old mine unless they had a mint behind them." American Smelting & Refining Company and Newmont Mining Company,

with their vast resources, declined to take the risk of exploiting this property. Nevertheless defendant took the gamble clearly realizing the many unknown features in the situation.

### The Issues.

The pleadings raise two separate and distinct issues. The first question for determination is the meaning of the contracts between plaintiff and defendant and whether defendant has performed its obligations thereunder. The second is the legal effect of defendant's promise to pay George A. Schroter a commission.

### The First Contract.

About August 15, 1936, defendant forwarded from New York to Grant Curry, plaintiff's president, at Pittsburgh a form of agreement between plaintiff and defendant. Thereupon Curry prepared a draft of agreement and forwarded it to Schroter in New York with the words "which we think covers the requirements in this matter and we would be glad to have you discuss it with Mr. Chadbourne." Chadbourne was abroad and Schroter took up with two vice presidents of defendant Curry's draft and said of it:

"I think your proposed agreement together with suggestions contained in the letter will be acceptable, with only few minor changes."

August 18, 1933, Schroter again wrote to Curry:

"I enclose 3 copies of Proposed Agreement between Sta. Maria & International.

"If the same meets with your approval will you execute two of same and return and I will have International do the same."

On August 25, 1933, Curry replied:

"I am enclosing herewith duly executed on the part of the Santa Maria del Oro Mines Co. duplicate Articles of Agreement with the International Mining Corporation.

"You will note that these forms have not been dated and I would request that you insert the date at the time of the execution of the Agreement by International."

On August 28, 1933, Schroter wrote Curry:

"I received the two agreements which were executed by you together with the letter of transmittal explaining about the stock and escrow instructions. I delivered the same to the International Mining Co. today."

Grant Curry, plaintiff's president, is a member of the bar of Pennsylvania and acted as one of the attorneys for the plaintiff. He had considerable experience in finance as he had been trust officer of the Colonial Trust Company of Pittsburgh. As a lawyer, he is presumed to have known and understood what he drafted and signed. He did not testify or claim that he was misled or that he did not understand any provision of the First Contract. There is no evidence that plaintiff was influenced in any respect in drafting the First Contract by Schroter.

The provisions of the First Contract may be summarized thus:

(1) An option to defendant to acquire 60 per cent. of plaintiff's common stock upon advancing to it sums aggregating $500,000 to be applied to mine development.

(2) The right to defendant at its election to advance to Santa Maria from time to time such funds as may in the judgment of International be required to dewater the Cocinera mine, provided that International shall not be required to advance for such purpose an amount in excess of $60,000 and provided further that said dewatering shall be completed within a period of 12 calendar months from the date of International's notification of its intention to undertake such operations.

(3) An option to defendant, after the expenditure of the $60,000, to advance to plaintiff $65,000 for the following purposes:

(z) repairing, equipping, and operating the pilot mill, and/or

(y) prospecting the mines, mining claims, and properties (or such of them as in the judgment of the engineers of defendant may be deemed suitable therefor), and/or

(x) developing ore bodies as in the judgment of defendant may be deemed suitable;

(w) paying Mexican taxes;

(v) paying plaintiff's state and federal taxes; and

(u) performing such other work on the properties and/or discharging such other business of plaintiff as defendant in its sole discretion may decide.

(4) plaintiff's obligation at the time of each advance to give defendant its promissory note for the amount thereof, with interest—such note to be a prior lien on plaintiff's property.

(5) When the advances reached $125,000, the surrender by defendant to plaintiff of its promissory notes, and the acceptance in lieu thereof, of preferred stock of plaintiff equal at par to the total then due.

(6) The option to defendant to advance plaintiff such further money, not exceeding $375,000 as in defendant's judgment, should be reasonably necessary "for the proper exploration and development of the said mines and properties, and for the purchase and installation of an adequate mill and other equipment for· production operations and for working capital in connection therewith," against which advances plaintiff obligated itself to deliver its preferred stock, in quantity at par equal to such further advances and interest.

(7) An obligation by plaintiff to deposit 60 per cent. of its common stock under an escrow agreement containing a provision "That the escrow agent shall be instructed to deliver said common capital stock to International [defendant] when and if International [defendant] has advanced the aforesaid sum of Five Hundred Thousand Dollars ($500,000.00)."

(8) The privilege to defendant of exercising full control and direction of all mining and milling operations in the properties and over all expenditures in connection therewith through its nominee mining engineer or engineers, with a like privilege to plaintiff to select and appoint one consulting mining engineer to act with the engineer or engineers so designated by defendant.

(9) The requirement that the properties be operated in accordance with good mining practice; plaintiff to be accorded full access to the properties and to all books of account, and to be furnished with copies of all reports made by the engineers.

It is clear that defendant could cease making advances at any time. It is likewise clear that the mine was not to be partially dewatered but dewatered to its lowest level.

By July 25, 1934, defendant had advanced to plaintiff $116,000 and plaintiff had given defendant its notes or receipts therefor. A sum in excess of $60,000 had been spent for dewatering alone although they had not reached the 6th level. This task of dewatering proved to be a much more difficult and expensive undertaking than had been estimated. After the making of the First Contract, defendant learned that plaintiff's charter would expire in 1935. Under the laws of Mexico, there was a possibility that title to the properties would be forfeited to the Mexican government. October 20, 1933, a conference was held. A memorandum thereof was sent to Grant Curry and to all the others who attended. July 12, 1934, Mexican was organized and plaintiff's property in Mexico was transferred to it in exchange for 685,000 shares of its common stock and the assumption by Mexican of the debts due from plaintiff to defendant for advances theretofore made. To protect defendant's rights it then became necessary to enter into a contract with Mexican.

The Mexican Contract.

A contract between Mexican and defendant was executed in Mexico City August 1, 1934. This contract recited the organization of Mexican, its acquisition of plaintiff's property in Mexico, its assumption of certain obligations of plaintiff to defendant, and its desire for further advances from defendant subject to defendant's "indisputable right to cease doing so at any time." The contract provided for:

(1) An undertaking by Mexican to mortgage its property to defendant to secure money then due as well as future advances;

(2) An obligation by Mexican to receive such advances as might·be made by defendant and to use them for:

(a) dewatering the mines so that a thorough "examination" could be made thereof by defendant's engineers;

(b) repairing, equipping, and operating a pilot mill;

(c) prospecting the mines according to the judgment of defendant's engineers;

(d) developing ore bodies according to their judgment;

(e) paying taxes in Mexico;

(f) performing such other work on the properties and discharging such other business of Mexican as defendant might decide;

(g) buying other properties within a 10-mile area;

(3) An obligation by Mexican to give a note for each such advance—all such to be payable on or before November 30, 1938;

(4) An obligation by Mexican to substitute for the notes issued—should defendant cease advancing before conclusion of work described above—notes, one-half of which were payable not later than January 1, 1936, and the others payable November 30, 1938;

(5) An obligation of Mexican on request of defendant at any time to execute a new mortgage to secure the total debt then due defendant;

(6) An option to defendant, upon completion of the work to be paid for by the $125,000, to advance to Mexican whatever money defendant deemed reasonably necessary (a) to exploit and develop the properties; (b) to install an adequate mill and other operating equipment; and (c) to provide working capital, which advances were to be on the basis provided for in an habilitation contract to be executed in accordance with specified Mexican law and which Mexican obligated itself to execute on defendant's request;

(7) An obligation of Mexican to do all the exploration, development, extraction, milling and smelting, subject to full supervision and direction by defendant, and the employment by Mexican of the engineer or engineers designated by defendant, with the right in Mexican to appoint a consulting engineer;

(8) Full access for plaintiff to the properties, books, and accounts. Defendant's engineers (employed by Mexican) were to use good mining practice; to be accountable to defendant and to be removed by Mexican on defendant's request; and to furnish each party copies of any report and "comply with all laws" relating to "the operation of the properties."

The execution of this contract was delayed until August 1, 1934, in order to incorporate the changes agreed upon between H. C. Hoffman and Grant Curry. Those changes were incorporated in the contract word for word.

### The Second Contract.

From August 30 to November 14, 1934, defendant advanced $59,000 to Mexican in addition to the funds theretofore advanced to plaintiff. This money was spent upon the properties while Mexican was under the control of plaintiff being then practically its sole stockholder. The president of plaintiff was president of Mexican. Substantially all of this money was spent in dewatering.

Because of the transfer of title to the mines by plaintiff to Mexican, it became necessary to enter into the Second Contract which was executed on November 13, 1934.

The amount for dewatering had exceeded considerably the $60,000, plaintiff's original estimate to defendant. The First Contract had provided for a mortgage up to $125,000. This amount had been expended by November, 1934. The Second Contract provided, among other things, for an increase in the amount of the mortgage from $125,000 to $175,000. In addition to the parties to the Second Contract, Grant Curry and H. W. Chadbourne, presidents respectively of plaintiff and defendant, were signatories as escrow agents.

The Second Contract contains:

(1) The recital of the execution of the First Contract, the common stock option, the impending expiration of the corporate life of plaintiff, the consent to the organization of Mexican and transfer of plaintiff's Mexican properties to it, the Mexican Contract, the latter's mortgage to defendant to secure $116,000 of advances, and the expression of a desire to make a new contract carrying the covenants and conditions of the First Contract with modifications in so far as they were not covered in the Mexican Contract.

(2) A copy of the Mexican charter, minutes of a shareholders' meeting of July 21, 1934, and of the directors' meetings of July 25 and July 27, 1934, copies of the by-laws and of the Mexican Contract, and Mexican's mortgage to defendant.

(3) The approval by plaintiff and defendant of the documents recited in paragraph (2) with a modification of paragraph 6 of the mortgage to the effect that the mortgage could not be transferred without notice to Mexican.

(4) The confirmation of an increase from $125,000 (the amount provided in the First Contract as the first advance) to $175,000 without change in the option to defendant to advance a total of $500,000.

324

(5) Definition of the expression "before the conclusion of the preliminary work" in the Mexican Contract as meaning "before the sum of $175,000 * * * shall have been advanced" and of the expression "after the conclusion of the work referred to in Clause Second" in the Mexican agreement as meaning "after advances amounting to the sum of $175,000 * * * have been made."

(6) The obligation of Mexican to increase the mortgage given by it under the Mexican Contract—if defendant should elect to stop before advances to Mexican reached $175,000—without the need of defendant taking preferred shares of Mexican in its place, and the obligation of plaintiff to increase Mexican's capitalization should defendant elect to continue until its advances totaled $175,000 so as to authorize Mexican to issue $175,000 of preferred shares.

(7) The surrender by defendant to Mexican of all of its notes received under the Mexican agreement (save certain few notes given for preliminary expenses) for preferred shares when available; the cancellation and surrender to Mexican of its mortgage for preferred shares at par in an amount equal to that of the notes and mortgages surrendered, plus interest.

(8) A proposed form of Habilitation Contract providing that all advances between $175,000 and $500,000 shall be made thereunder.

(9) The obligation of defendant to cause the Habilitation Contract to be canceled and surrendered to Mexican if and when defendant completed advances to Mexican for the additional $325,000 and (pursuant to the provisions of the contract) became the holder of 60 per cent. of the latter's common stock; and the obligation of plaintiff to cause to be delivered to defendant preferred shares of Mexican equal to the amount of those advances, plus interest thereon.

(10) The deposit of 684,100 shares of Mexican with the escrow agents subject to the terms of the escrow.

(11) The obligation of the escrow agents to hold those shares and deliver 411,000 thereof to defendant and the balance to plaintiff when defendant should furnish notes or receipts of preferred shares showing advances of $500,000 to Mexican.

(12) After the advance of $500,000, the obligation of plaintiff to deliver to defendant resignations of its nominee directors of Mexican sufficient to allow defendant thereafter to have majority representation on the board, whereupon the 60 per cent. of Mexican's common stock should become deliverable to defendant.

(13) A declaration that the escrow agents held their position only because of their respective official relations to plaintiff and defendant.

The Habilitation Contract.

The Habilitation Contract between Mexican and defendant called for by the Second Contract was executed on December 19, 1934. Between the date of the Second Contract, November 13, 1934, and December 19, 1934, defendant had advanced to Mexican a further sum of $53,000 and had expended by that time approximately $144,000 for dewatering alone.

This agreement (made at a time when Mexican was controlled by plaintiff) recited the organization of Mexican on July 12, 1934, and the acquisition by Mexican of the Mexican properties. It also recited five different advances made by defendant since November 14, 1934, totaling to December 18, $53,000, and Mexican's desire to have defendant "continue to advance funds for the development of the mines * * * and * * * acquiring equipment, machinery and other things necessary for this purpose," and also "to pay salaries, wages, materials, and direct expenses indispensable for the purposes of the business," and the willingness of defendant to grant such loans.

The contract provided:

(1) Defendant, reserving to itself the right to terminate the agreement at any time, granted Mexican a credit which should be used exclusively for the objects set forth in the above quoted portion.

(2) Mexican was to use the credit in partial amounts and to notify defendant "of the expense incurred in connection with the matters referred to in paragraph III of the preamble, such as salaries, wages, taxes, materials, etc., and for the purchase of tools, equipment, machinery, implements and other things for the construction of a mining plant in accordance with the requirements of the business. All purchases made outside of the country shall be made

by International (defendant) and for this purpose the corresponding orders shall be sent to it and the value of such purchases * * * shall be charged to the account of the credit hereby granted."

The Habilitation Contract in addition to its general covenants, was in effect a mortgage to secure future advances. Of the $325,000 advanced to Mexican under the Habilitation Contract all but $148,205.-31 was spent while Mexican was controlled by plaintiff.

The four contracts are clear and unambiguous. They contain no guaranty on the part of defendant to erect a mill or put the property in production. Plaintiff, without pointing out any ambiguity in a single phrase in any of the contracts, attempts to invoke the rule of law that an ambiguous contract should be construed against the person preparing it. The difficulties with plaintiff's position are: (1) That the First Contract in its final form was drafted by Grant Curry, save a few minor modifications; (2) that the Mexican Contract contained all the suggestions made by Curry and was attached to the Second Contract as an exhibit and fully approved thereby; and (3) that all four contracts are clear and unequivocal.

■ Plaintiff contends that the contracts should be construed so as to place defendant in the position of a guarantor. That with $500,000 defendant guaranteed to dewater the mining properties, exploit and develop them, build and equip an adequate mill, supply working capital, and place the properties in profitable production. This would entail as a necessary corollary that should $500,000 be insufficient defendant was bound to accomplish these results no matter what it cost.

An analysis of the contracts makes it clear that there was no obligation imposed upon defendant to make any advances. Any advances made were entirely optional with it.

By article 5 of the First Contract, defendant had the option to advance to plaintiff such funds as in the judgment of defendant "shall be reasonably necessary for the proper exploration and development of the said mines and properties, and for the purchase and installation of an adequate mill and other equipment for production operations and for working capital in connection therewith. The maximum amount which International [defendant] may be called upon to advance to Santa Maria [plaintiff] * * * shall not exceed * * * a total of Five Hundred Thousand Dollars ($500,000.00). * * *"

This explicit language is a complete answer to plaintiff's argument.

On November 14, 1934, when the Second Contract was executed, defendant had advanced approximately $175,000, although the mines had not been dewatered below the 6th level. The influx of water was so great that it took until May of 1935 before the 7th level was bared.

To transmute the optional character of defendant's obligation, such as it was, to a guaranty of performance that the mines would be dewatered, exploited, sufficient ore bodies developed, an adequate mill built and equipped, and sufficient working capital provided, is impossible without doing violence to the simple and unequivocal language of the contracts. If the parties had intended a guarantee, it would have been a simple matter to have inserted a provision:

"The defendant hereby guarantees that it will dewater the mines, exploit them, develop the ore bodies therein, erect an adequate mill and equip it, and provide working capital, all for the sum of $500,000."

Proof manifesting complete compliance by defendant with the First and Second Contracts is found in the very construction placed upon those contracts by the parties. It stands unchallenged that $350,000 was spent before April, 1935, partly by plaintiff and partly by Mexican while plaintiff controlled the mine. After defendant controlled the mine, the balance of the $500,-000 was spent upon the same kind of work.

Not once during the period in which the $350,000 was being spent was there any suggestion or intimation that any specific part thereof should be reserved or set aside for the erection of an adequate mill, or its equipment, or to provide working capital. With full knowledge from the weekly progress reports and the monthly statements concerning the use of the money that defendant had advanced, it would be natural—if plaintiff regarded the erection of a mill as a contract obligation—to expect a request from plaintiff to allocate a portion of each advance for the future erection of a mill. But no such request was made. Manifestly, plaintiff did not regard the erection of a mill as a term of the contracts. The application of the money advanced by defendant under the four

contracts between September, 1933, and July 31, 1935, and the clauses of the contract authorizing such application is shown by the following tabulation:

Dewatering of Mines........................ $228,085.73
 Article 2, Section (a) of First Contract. Clause Second of Mexican Contract, Section (a). Preamble II of Habilitation Contract.
Examination of Mines....................... 9,312.17
 Clause Second of Mexican Contract, Section (a).
Repairing of Pilot Mill..................... ——
Prospecting of Mines....................... 43,364.00
 Article 2, Section (b), Sub-division (y) of First Contract. Clause Second, Section (b) of Mexican Contract.
Exploration & Development Work......... 41,272.93
 Article 2, Section (b), Sub-division (x) of First Contract. Article 5 of First Contract. Clause Second, Section (c) of Mexican Contract. Preambles II and III and Clause 3 of Habilitation Contract.
Other Work ................................. 6,846.25
 Article 2, Section (b), Sub-division (u) of First Contract. Clause Second, Section (f) of Mexican Contract.
Plant for Production Operations.......... 61,777.76
 Article 5 of First Contract. Preamble II and Clause Third of Habilitation Contract.
Working Capital ........................... ——
Other Equipment .......................... 9,390.65
 Article 5 of First Contract. Preamble II and Clause Third of Habilitation Contract.
Buildings .................................... 22,458.00
 Article 5 of First Contract. Preamble II and Clause Third of Habilitation Contract.
General Expense ........................... 121,893.40
 Article 2, Section (b), Sub-division (u) of First Contract. Clause Second, Section (f) of Mexican Contract. Taxes—Article 2, Section (b), Subdivisions (w) and (v) of First Contract. Clause Second, Section (e) of Mexican Contract. Purchase or Denouncement of Other Properties—Article 14 of First Contract. Clause Second, Section (g) of Mexican Contract.

Total of Expenditures...................... $544,400.89
Balance of Funds July 31, 1935............. 30,599.11

Total of Funds advanced up to and including July 31, 1935.......................... $575,000.00

■ The contracts empowered defendant to exercise full control and direction of all operations upon the mining properties and over all expenditures in connection therewith. Defendant's judgment is final and cannot·be set aside without clear and convincing proof of. fraud.

The judgment to be used in pursuing any course of operation upon the mining properties was conferred exclusively upon defendant. It and it alone was to determine what should be done and how much should be spent in connection therewith. The only limitation placed upon it was that the operations themselves were to be conducted in accordance with good mining practice. It was natural that the contracts conferred this right upon defendant because it was defendant's funds that were being used. Defendant was just as anxious ·as plaintiff to put the property in commercial production. The only way that it could hope not only to recoup the moneys that it had advanced, but to make some profit, was to make the enterprise successful.

Plaintiff and defendant knew that every mining operation is a hazard. Many elements enter into the final outcome of a mining venture. Time and experience are the only solvents. Ore may be found in one level that will not continue in another. A vein might break off so completely that no further trace of ore can be found. The hazards of dewatering cannot be prophesied. Mining engineers called as witnesses by defendant were unanimous that defendant's operations were conducted according to good mining practice.

■ The case resolves itself into a question of whose judgment was to control. The authorities are clear that when by a ' contract the right to choose the things to be done or the method of doing them is confided to the judgment of one party the determination of that party is conclusive.

### Plaintiff's Position is Inequitable.

■ Plaintiff had full knowledge of the moneys advanced by defendant and spent by it and Mexican. It had complete information as to the manner in which the moneys were expended through the weekly progress reports and accompanying financial statements. These financial statements were prepared by the accounting department of Mexican. They set forth the disbursements, the bank balances, and the moneys received. These statements fully advised plaintiff of all activities and their cost.

Plaintiff waited until May 27, 1935, when nearly all the $500,000 had been expended before it made formal demand "that International immediately proceed to discharge its obligations under the said agreements by providing and installing an adequate mill and other equipment for production operations. * * *"

Under all of the contracts, defendant had been a secured creditor for all the advances. Plaintiff permitted defendant to advance its money and to change its position as a secured creditor into the less favorable position of a stockholder.

Plaintiff's suggestion that at some time the program of operations at the mine was changed is fully answered by the testimony of Karl F. Hoffmann:

"Q. It has been suggested that there was a change of program to a very much larger program or operation than had been originally contemplated. By the light of your knowledge of that operation, what have you to say as to this suggestion? A. Why, we never have changed our program at all. Our program has been to unwater and sample the mine, and after that was done we would consider a mill building campaign, but not until that was done.

"Q. What was your constant purpose in doing all of the work that you did do on that property? A. Our constant purpose was to determine the quantity and value of the ore and the ore reserves in the quickest and cheapest way we could."

As a result of defendant's development work the mines were dewatered down to the 7th level, the 5th and 6th levels have been extended, and deposits of ore have been uncovered and sampled. Metallurgical tests have been made so that the appropriate treatment of the ores is now understood.

Under the above facts, the relief sought by plaintiff is clearly inequitable.

The burden was upon plaintiff to establish that defendant was guilty of improper and reckless spending, that it deviated from the contracts, and that the moneys advanced were wasted. Plaintiff has failed to sustain that burden. Not one cent was spent for noncontract uses. Defendant has fully performed its obligations under the contracts.

 Plaintiff requests the finding:

"The relationship between the parties under the contracts was that of a joint adventure and defendant was therefore acting in a fiduciary capacity in carrying out the terms of the contracts."

The relationship of the parties is not defined by the doctrine of joint adventure. Here the respective rights and duties of the parties are expressly defined by the terms of contracts. These contracts exclude the application of the doctrine of joint adventure.

### Schroter's Commission.

 The issue raised by the pleadings at the supplemental hearing was the legal effect of defendant's promise to pay to George A. Schroter a commission. This court clearly recognizes that where one party to an agreement pays or promises to pay a secret commission to an agent of the other party at or before the making of the agreement such agreement is voidable on the ground of fraud. Under such circumstances, this court would have no hesitation in declaring the contract void. The question is whether the doctrine applies in this case. That question can be solved only by a consideration of the facts.

The vital considerations relative to the promise of a commission are (1) when was the promise made, and (2) was it made to an agent of one party or to the agent of both parties.

George A. Schroter was compensated for services rendered in connection with these Mexican properties from the time of his original employment by Grant Curry in 1927 until 1935 when he relinquished all employment. From 1927 to 1930 he acted as consulting engineer for the Curry interests and directed the expenditure through Tighe, the resident engineer at the mine, of $200,000 in drilling. From 1930 to 1933 he received no compensation but was active in seeking to interest leading mine development companies in the property. When he succeeded in interesting International in August, 1933, Grant Curry spoke to him about his compensation. It was then agreed that 10 per cent. of the stock the Currys should receive would be paid to Schroter. After the making of the First Contract of August 28, 1933, and in the following month while Schroter was at the mine with Hoffmann, his regular compensation as consulting engineer was agreed upon. Some months thereafter Schroter approached Chadbourne and asked for additional compensation, the equivalent of a finder's fee. Chadbourne promised to pay Schroter 2 per cent. of whatever stock International finally received.

According to the testimony of Schroter, the promisee, and of H. W. Chadbourne, the promisor, and of two vice presidents of the defendant company, the promise of a commission was made months

after the First Contract was entered into. The only evidence in the case that tends to contradict this testimony is the language of a minute drawn a year or more after the promise was made by a secretary of the executive committee of the defendant having no knowledge of the event. Schroter testifies:

"Now, things got started there in 1933. The machinery was coming along nicely in operations, and the International people were good and hot about the proposition. I should say this was around December or January 1934. I went into Mr. Chadbourne's office, I said 'Now Skipper', I said, 'I have been working on this proposition for six years, half of the time spending my own money and time'. I said, 'I am not getting enough out of this deal to make me happy. I am telling you right now' —I said, 'Skipper, if this mine turns out to be a big proposition, I think the International should do something for me.' Mr. Chadbourne never opened his face to me about giving me a commission. I brought that out, and Mr. Chadbourne said, 'Bill,' he said, 'I think you are right, and I will try to arrange to give you something.' He said, 'How would 2 per cent. of the stock go, if I could arrange it?' I said, 'Fine, Skipper.' That was the conversation I had with the International about that commission which I never received."

Humphrey W. Chadbourne, president of defendant, testified:

"Q. Now, subsequent to the signing of the contract, did you ever have a talk with Mr. Schroter on the subject of commission? A. Yes, sir.

"Q. Can you place the date and place such talk? A. Mr. Karl Hoffmann called me in his office one day, and said that—that was, as near as I can place it, about two or three months after the signing of the contract—within two or three months, and told me that Mr. Schroter was speaking of a commission which I had promised, and Mr. Hoffmann said that he was present with Mr. Schroter when I promised him a commission.

"Q. A commission for what, if anything was said on that? A. A commission for bringing the Santa Maria to us. It was our custom to pay a commission; we live on that. Almost all of our business that we derive comes from people to whom we pay a commission for bringing the business.

"Q. In other words, you mean that sometimes persons other than your own staff have information concerning properties which might be of interest to you? A. It usually comes from people outside of our staff; the original offering of the property usually comes from people outside of our staff.

"Q. Well, is that something in the trade known as a discovery or finder's fee? A. Yes, sir.

"Q. Was that this type of commission? A. Yes, sir.

"Q. Now, what further was said? See if I have it correctly; Mr. Hoffmann came into your office with whom? A. I think I went into Mr. Hoffmann's office. He asked me to come in, or I was walking by.

"Q. Was Mr. Schroter there? A. No.
* * *

"A. Well, some short time after that, Mr. Schroter came into my office and asked me for the commission, and I told Mr. Schroter that the circumstances I had forgotten about, but that Mr. Hoffmann had reminded me, that we were willing to pay him a small commission if he could assure me that Mr. Curry knew all about it and agreed to it. * * *

"A. He told me at that time as I remember. He also told me before. He told me at that time that he was receiving a commission from the Currys.

"Q. What further was said between yourself and Mr. Schroter? A. Mr. Schroter said that that would be all right, that he would speak to Mr. Curry and get that assurance; that it was satisfactory. A few —I should say a few weeks later—* * *

"A. Mr. Schroter told me that he had seen Mr. Curry and Mr. Curry was pleased that he should receive some commission from us."

Karl Hoffmann testifies:

"A. Well, some time after we had started operations down there, Mr. Schroter came into my office and asked whether I did not think he was entitled to some commission for having brought the business to us. It has been our custom to give people an interest in business when they bring it to us, and I told him that I thought he had better talk to Chadbourne about it; so I took him into Mr. Chadbourne's office, and we discussed the matter. Mr. Chadbourne said that he thought that he

was entitled to some interest; that he did not think a man should take an interest from both sides, without the other parties knowing about it, and Mr. Schroter said he thought that that would be all right. Then some months later, I think it was after the Mexican company was formed, I am not sure, Mr. Schroter came in again and said, 'how about my commission?' I said, 'Well, you will have to see Chadbourne again about that; haven't you got it in writing'? And he said, 'No.' I said, 'You had better see Chadbourne again.' I asked him whether he had talked to Mr. Curry about it. He said that Mr. Curry would be very much pleased if he should get a commission from us. He told me at the time that for some years he had been trying to promote this property without any pay from Mr. Curry, and that Mr. Curry would be pleased if he was to get a commission."

Under cross-examination Hoffman testifies further:

"XQ. Well, now, let me see if I can refresh your recollection about this commission business. At about the time this deal was closed, Mr. Schroter came to you, you say, and suggested that he was not getting enough from the Currys, and he ought to have an additional commission, is that right? A. No, that is not right.

"XQ. What did he say? A. It was quite a long time after.

"XQ. How long afterwards? A. It was several months after we started the work there."

George A. Easley, a vice president of defendant, testified that in September of 1934 he was discussing with Schroter some engines the latter had purchased for the Santa Maria property. Easley asked Schroter: "George, what are you getting out of this?"

To which Schroter responded: "Well, I am getting 4 per cent. or 10 per cent. of the 40 per cent. that was being given by [to] the Curry interests, and I am going to get an interest from the International Mining."

Thereupon Easley stated: "George, I am surprised at that. I am on the Executive Committee and a director of the company and I have never heard anything that you were getting from the International Mining Corporation."

Easley asked Schroter if he had spoken to Chadbourne concerning the matter: "You had better speak to Mr. Chadbourne about it, and take it up, so that it can go through the regular route, and be discussed. * * * You appreciate if you do get anything from the International Mining Company, it must be understood by the other side, because of the seriousness of getting commissions. * * *"

Schroter told Easley: "that the Curry interest knew about the commission, and that they were very pleased that he [Schroter] was getting something from the other side. He stated he had worked six or seven years for the Curry interests, and had gotten no pay practically out of it and had worked very hard, and it seemed natural to me that they would be quite pleased."

There were other talks between Schroter and Easley. One about three weeks or a month later, at which Easley inquired of Schroter if the latter had taken up with Chadbourne the question of a commission from International. Again Easley advised Schroter: "Now, George, as a friend of yours, and as having had experience in this business before, I urge you to go and get everything that you have in the way of commissions in writing, both from the Curry interests and from the International."

Schroter was told by Easley that the latter, though a member of the executive committee and a director of defendant, had never heard anything about any commission being paid by defendant and that before a commission could be paid it had to come before the executive committee. Easley stated also: "George, you know we have partners in this business, that is, the Lehman Corporation and Case-Pomeroy, and I said, 'I am positive they know nothing about any commission;' and I said, 'If any commission is coming and they do not know about it, or anything, it will have to come from somebody beside the International interests, it goes through the Executive Committee and Board of Directors, and our partners are told about it.'"

The next discussion on the subject between Schroter and Easley took place in November or December, 1934, at a Duck Club at Barnegat, N. J. The latter had asked Schroter to go duck shooting with him. Easley again discussed the matter with Schroter and advised him to take the question up with Chadbourne.

In April of 1935 Schroter informed Easley that he had fixed the matter up and was going to get 2 per cent. from Interna-

tional and 4 per cent. from the Currys, and Easley asked him: "Do all sides understand it?" to which Schroter responded: "Yes, they do understand it." and said: "George, you can take it from me that my cards are all on the table."

The testimony of the four witnesses above recited is corroborated by the documentary evidence in the case. Two New York banking houses agreed to share in defendant's commitments under the First Contract. These participation contracts are dated November, 1933, and do not mention a commission to Schroter. If defendant had promised to pay a commission to Schroter as early as November, 1933, these contracts would have reflected it. Later the associates were advised of the commission and agreed to pay their share.

The only evidence to contradict the testimony of these four witnesses and the documentary corroboration is an interpretation by plaintiff of certain language in a minute of the executive committee of defendant. It may be noted that defendant itself introduced the minute as evidence that it was acting aboveboard and not secretly. The minute was drafted by the secretary of the committee who had no personal knowledge of the transaction a year or more after the event. The minute reads: "The Chairman further stated that, in accordance with an understanding had with Mr. George A. Schroter at the time the original agreement was made with the Curry interests, Mr. Schroter was to receive, for his services in arranging the agreement between this Corporation and the Curry interests, 2% of the common stock received by this Corporation from the Curry interests".

Defendant bases its whole case of fraud upon the words in the minute "at the time the original agreement was made." Plaintiff contends this language proves that the testimony of Schroter, Chadbourne, Hoffmann, and Easley is false. After weighing all the evidence, I am of opinion and find that the language of the minute is incorrect and that the testimony of the witnesses that Chadbourne's promise was given some months after the making of the contract is true. Shortly before the entry of the minute defendant had received the stock and it was appropriate that some corporate action should be taken and recorded relative thereto. The minute was not a contemporary entry at the time of the promise by a person having knowledge of the event but merely a customary corporate entry authorizing the issuance of stock. Finding that the promise of Chadbourne to pay a commission to Schroter was after the making of the contract it can not influence or impair that contract. It is not evidence of fraud whereby the contract can be rescinded.

The second vital consideration relative to the promise of a commission is whether the promise was made to the agent of one party to the contract or to the agent of both parties. The uncontradicted testimony in this case is that after the making of the First Contract George A. Schroter became the consulting engineer of both parties thereto.

September 22, 1933, defendant notified plaintiff in writing: "We would advise that it is not our intention at this time to appoint our own engineer to direct the said dewatering operations; it will be satisfactory to us that such supervision as may be necessary of that work be exercised by Mr. George A. Schroter, who has been made fully aware of our wishes in connection therewith."

As the work at the mine was confined to dewatering for at least a year, the letter was appropriately restricted thereto. That Schroter was acting as consulting engineer or joint agent of both parties is conclusively proved by the testimony of Grant Curry. He testifies:

"XQ. Mr. Karl Hoffmann functioned within your knowledge as International's engineer under the contract, did he not? A. No, sir.

"XQ. He did not? A. No, sir.

"XQ. Do you mean to say that he did not so function or that you do not know if he did or if he did not? A. Shortly after the contract was signed, Mr. Chadbourne—

"XQ. I did not ask you for an explanation of your answer, but I simply want to find our whether your 'No' was positive within your knowledge, or when you said 'No' you did not know? A. To the best of my knowledge Mr. Hoffmann did not function as consulting engineer for International, because Mr. Schroter did.

"XQ. For International? A. For both companies at the suggestion of Mr. Chadbourne. * * *

"RDQ. Who was the International consulting engineer at the mine when the first

contract was entered into? A. So far as I know, they had no consulting engineer at the mine at that time.

"RDQ. Who was it that told you that it was desirable to install additional pumps and power in order to dewater the seventh level? A. I think my information came from copies of correspondence and I believe Mr. Schroter mentioned that fact. * * *

"RDQ. Who was the engineer for the International? A. I believe Mr. Hoffmann had been acting as engineer. Shortly after the contract was entered into, Mr. Chadbourne suggested that rather than have both parties employ separate engineers, as a consulting engineer, that since we were partners now, and both had confidence in Mr. Schroter, that we both accept him, and this was agreed to. * * *

"RXQ. You say it was agreed that Mr. Hoffmann should act as consulting engineer; was this proposal in a letter, or by word of mouth? A. No, sir. It does not relate to Mr. Hoffmann. It relates to Mr. Schroter.

"RXQ. That Mr. Schroter should act as consulting engineer? A. Mr. Chadbourne verbally suggested that Mr. Schroter act as consulting engineer for both parties.

"RXQ. And when was that suggestion made? A. I can not fix the date definitely. It was shortly after the execution of the contract. I would say within a month or six weeks.

"RXQ. So that the International had its own engineer other than Hoffmann; you had your own consulting engineer, Mr. Schroter, and by suggestion of Mr. Chadbourne, Schroter was to act as consulting engineer for both parties? A. Yes, sir."

This is the testimony of the president of plaintiff who for the better part of two years paid Schroter's salary and was personally acquainted with the services he rendered.

A commission to a joint agent is not a commission to the agent of one of the parties and the doctrine of avoidance of a contract by reason of a secret commission has no application to this case.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.

The bill of complaint as amended must be dismissed.